IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERICAN FEDERATION OF STATE | : | CIVIL ACTION |
| COUNTY AND MUNICIPAL EMPLOYEES | : | |
| DISTRICT COUNCIL NO. 33, AFL-CIO, et al. | : | No. 03-371 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA | : | |

<u>**MEMORANDUM**</u>

**Juan R. Sánchez, J.**                                                                                          **March 29, 2012**

      Plaintiffs, the American Federation of State, County and Municipal Employees District Council (AFSCME) No. 33, AFL-CIO, AFSCME Local 394, AFSCME Local 1510, Herman "Pete" Matthews, the President of AFSCME District Council No. 33, Leroy Simmons, Frank Lovett, and Lawrence Muhammed, individually, and on behalf of all others situated, brought this class action against the City of Philadelphia (City) seeking to prohibit the City from unlawfully drug testing its employees represented by District Council 33 (DC-33) in violation of their rights under the Fourth and Fourteenth Amendments of the United States Constitution. DC-33 and the City settled with court approval the class-wide claims and all individual claims except Leroy Simmons's claim. Simmons alleges there was no individualized suspicion to require him to submit to a drug test or just cause to terminate his employment. The City asserts, however, Simmons's constitutional rights were not violated because the City had reasonable suspicion to compel Simmons to undergo testing for alcohol use, and just cause to terminate his employment based on the following: (1) Simmons tried to extort $500 from a customer; (2) the City received a complaint Simmons had been drinking on the job; and (3) Simmons misrepresented the facts of

the incident during his pre-disciplinary hearing. As a result of his termination, the City also asserts Simmons is not entitled to economic or other damages.

**FINDINGS OF FACT**

1. Simmons was hired by the City of Philadelphia Water Department on January 23, 1995. In 2001, Simmons was working as a Water Distribution Repair Worker leading a four-to-five-man crew fixing broken water mains, excavating holes, and repairing water leaks.

2. On January 26, 2001, Simmons and his crew members were repairing a water main leak which was disrupting a property owner's business and creating a hazardous condition. The property owner, a private citizen, contacted the Water Department to report Simmons had demanded $500 to repair the water service supplying the property or else Simmons would make the water problem more severe. The citizen-owner also complained the crew, and Simmons in particular, was engaged in the consumption of alcohol while on duty at the job site.

3. Upon receipt of the complaint, Water Department superintendent George Stokes went to the job site to assess the situation. Stokes determined the entire crew had to submit to alcohol testing based on the Water Department's policy on alcohol and/or drug testing at the time, which required all employees suspected of alcohol and/or drug use while on the job submit to testing.

4. Around 9:00 p.m., Water Department superintendent Christopher Toohey called Michael Augustyn, the Water Department's Safety Administrator, to determine where the crew should be taken for alcohol testing. Augustyn advised Toohey the City uses Methodist Hospital for its alcohol and drug testing. Accordingly, Simmons and his crew members were taken to Methodist Hospital.

5. In the waiting room at the hospital, Augustyn addressed the crew, and required that all crew members submit to a breathalyzer test to detect alcohol consumption. Augustyn spoke to

Simmons face-to-face, during which time Simmons asked Augustyn what would happen if he refused to take the alcohol test. Before answering Simmons's question, Augustyn called his supervisor, Lorin Fields, Human Resources Manager, from whom he learned that an employee's refusal to submit to a breathalyzer test could be used against the employee in a later disciplinary proceeding. Augustyn relayed this precise information to Simmons.

6. During his conversation with Simmons, Augustyn observed Simmons had a glassy and glazed look in his eyes, slurred speech, an unsteady gait, and he smelled alcohol on Simmons.

7. Simmons then went into the room where a technician was waiting to administer the breathalyzer test. Simmons again asked Augustyn what would happen if he failed to take the alcohol test, and Augustyn repeated his previous answer. Simmons ultimately refused to submit to the test. With the exception of Simmons, the entire crew submitted to the breathalyzer test.

8. The Water Department did not request a drug test be administered to Simmons or any other crew member. Simmons was asked by Augustyn, on behalf of the Water Department, only to submit to alcohol testing. After Simmons refused the test, Augustyn drove him home.

9. Simmons's explanation that he refused the alcohol test because he was being forced to take both an alcohol and a drug test, and not just an alcohol test, is not credible, nor is Simmons's account of how he arrived home that night, testifying not that Augustyn drove him home, but that he drove himself home in a Water Department truck. On both of these points, Simmons's testimony directly contradicted Augustyn's, which was clear, unequivocal, and credible.

10. Francis Meiers had been working for the Water Department since 1980 and, at the time of the January 26, 2001, incident, was the Water Department's Assistant Personnel Officer charged with overseeing disciplinary matters within the Department. Meiers conducted an investigation into the allegations against Simmons of attempted extortion and alcohol consumption on the job

site. His investigation included an interview with the property owner, as well as a pre-disciplinary hearing.

11. At the conclusion of his investigation, Meiers determined there was credible evidence that Simmons attempted to obtain money from a citizen, was drinking alcohol while on the job, and failed to submit to alcohol testing. Meiers also found Simmons consistently misrepresented the facts surrounding the incident at the pre-disciplinary hearing. As a result of his investigation, Meiers recommended Simmons's dismissal.

12. Attempted extortion, alcohol consumption while on the job, and misrepresentation of facts at a Departmental hearing are all violations of long-standing Water Department policy. Attempted extortion, by itself, is sufficient to warrant dismissal.

13. Simmons was arrested on March 20, 2001, for theft by extortion, bribery, terroristic threats, and harassment. The charges were later dismissed, however, because no one appeared to testify at the preliminary hearings.

14. On March 22, 2001, Simmons was suspended without pay and given notice of intent to dismiss as a result of the events on January 26, 2001. Effective April 6, 2001, Simmons was dismissed from his employment with the Water Department for attempted extortion, alcohol consumption while on the job, and misrepresenting facts during a disciplinary hearing.

15. During his employment with the City, Simmons participated in a Defined Benefit Pension Plan. Under the Plan, employees contribute a portion of their bi-weekly wages into the City Pension Fund. The City then makes a separate contribution to the Fund on behalf of its covered employees. If an employee leaves his employment or, for whatever reason, closes his account or is not entitled to a Pension benefit, the employee is entitled to a refund of the contributions the

employee made to the Fund during the employees' employment. However, the employee is not entitled to any refund of the City's direct contributions.

16. Subsequent to Simmons's termination, Simmons withdrew the money he had contributed into his Fund.

17. Since his termination over a decade ago, Simmons has not found full-time employment, but he also has not aggressively searched for a job either; although Simmons has visited job search websites, he has never applied for any job.

18. On June 19, 2006, the City and DC-33 entered into a partial settlement of this case. The City agreed to reinstate Simmons, provided he submit to certain conditions, one of which was a routine medical evaluation which included a drug and/or alcohol test. The City also agreed to restore his pension and welfare benefits. Hr'g Tr., 12-13, June 19, 2006 (Angell, J.).

20. Simmons failed to submit to the required medical evaluation in accordance with the terms of the June 19, 2006, settlement agreement. As a result, the City did not reinstate Simmons or restore his benefits. Because Simmons had withdrawn his portion of contributions made to the City Pension Fund, and Simmons was not reinstated, the City closed his account.

21. Under the City Pension Fund, Simmons is not entitled to a refund of the City's separate contributions to the Fund made on his behalf.

**DISCUSSION**

The City followed the procedure approved in *Gniotek v. City of Philadelphia* before terminating Simmons. 808 F. 2d 241, 243 (3d Cir. 1986) (holding "when threatened with dismissal, a public employee with a property interest in his job is entitled to a 'pretermination opportunity to respond, coupled with post-termination administrative (or judicial) procedures'" (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547-48 (1985)). Prior to his

termination, Simmons received notice of the charges against him and an explanation of the Water Department's evidence against him, and was given an opportunity to respond. Thereafter, Simmons appealed his dismissal.[1] The issues before this Court are (1) whether the Water Department had reasonable suspicion to compel Simmons to submit to an alcohol test, and just cause to terminate his employment; and (2) whether Simmons has the right to a refund for the City's portion of contributions it made to Simmons's pension fund on his behalf.

It is settled law that a compulsory drug and/or alcohol test is a search within the meaning of the Fourth Amendment. *See Shoemaker v. Handel*, 795 F. 2d 1136, 1142 (3d Cir. 1986). Such tests are permissible without a search warrant, however, where reasonable suspicion exists. *Copeland v. Phila. Police Dep't*, 840 F.2d 1139, 1143-44 (3d Cir. 1988). Reasonable suspicion must exist as to the particular individual to be drug tested. *Ybarra v. Illinois*, 444 U.S. 85, 91-92 & n.4 (1979). In determining whether reasonable suspicion exists to compel a drug/and or alcohol test, courts must consider: (1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other factors contributing to the suspicion. *Copeland*, 840 F.2d at 1144.

In this case, the City had reasonable suspicion Simmons was drinking alcohol while on duty on January 26, 2001. First, the citizen's complaint of extortion and report that the crew, and Simmons in particular, were consuming alcohol while on the job was reliable. On January 26,

---

[1] The subject incident occurred on January 26, 2001. Trial Ex. D-56. Following the incident, the Water Department, lead by Meiers, conducted a pre-disciplinary hearing, at which time Simmons was afforded the opportunity to respond to the allegations against him. On March 22, 2001, Simmons was provided with notice of his suspension without pay, as well as notice of the City's intention to dismiss. Trial Exs. D-52 and D-53. On April 6, 2001, Simmons was terminated. Trial Ex. D-54. Simmons appealed his termination, which was heard by the Civil Service Commission on February 11, 2003. Trial Ex. D-59. On March 13, 2003, the Civil Service Commission issued its findings and denied Simmons's appeal. Trial Ex. D-55.

2001, Gary Jenkins, the private citizen property owner, lodged a formal complaint to the police that Water Department crew using vehicle number 870083 demanded $500 for the job they were doing at his property, or they would make the problem worse.  Trial Ex. D-56.  Jenkins also later recounted the details of the incident to Meiers during the pre-disciplinary fact-finding investigation.  Jenkins identified Simmons as the crew member who demanded the money and also told Meiers he saw him drinking at the job site.  Trial Ex. D-59, at 7-10.  Jenkins's formal complaint to law enforcement authorities bore sufficient indicia of reliability in and of itself because the complaint was specific, it contained information not known to the public at large, and most importantly, the citizen's identity was known and thus could be held responsible for providing false information.  *U.S. v. Savage*, 677 F. Supp. 2d 756, 762 (E.D. Pa. 2009) (finding citizen's tip bore sufficient indicia of reliability because citizen's identity was known, citizen could be held responsible had she misinformed police, and the information she provided was uniquely known by her and not available to the general public); *Nesmith v. Cathel*, No. 05-4069, 2007 WL 2247899, at *16 (D.N.J. Aug. 2, 2007) (stating information received from a known informant "whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is accompanied by sufficient indicia of reliability, unlike an anonymous tip which "alone seldom demonstrates the informant's basis of knowledge or veracity") (quoting *Florida v. J.L.*, 529 U.S. 266, 270 (2000)).

Second, the circumstances surrounding the incident of January 26, 2001, and the subsequent Departmental pre-disciplinary fact-finding investigation corroborated Jenkins's complaint.  Immediately after receiving the complaint, Water Department superintendent Stokes went to the job site to assess the situation and determined the entire crew had to submit to alcohol testing.  Augustyn went to Methodist Hospital where the crew members had been taken.  There,

Augustyn addressed the crew and required all crew members submit to alcohol testing. Augustyn spoke directly to Simmons about taking a breathalyzer test. During this face-to-face conversation, Augustyn testified he smelled alcohol, and noticed Simmons had a glassy and glazed look in his eyes, slurred speech, and an unsteady gait. Simmons asked Augustyn what would happen if he refused the test. Before responding, Augustyn called Fields, the Human Resources Manager, who advised Augustyn that an employee's failure to submit to an alcohol test could be used against that employee in a later disciplinary proceeding. Augustyn reported this information to Simmons exactly as Fields had told it to him. Simmons then went into a room in the hospital where a technician awaited administration of the breathalyzer test. Inside the room, Simmons again asked Augustyn about the consequences should he refuse the alcohol test, and Augustyn repeated his previous answer. Simmons ultimately refused to take the alcohol test. Although Simmons claims he refused the alcohol test because he was being forced to take a drug test and an alcohol test, and not just an alcohol test, this Court does not find his explanation credible. This Court accepts Augustyn's testimony as clear, unequivocal, and credible; Simmons was asked only to take an alcohol test, which the City had the right to compel given the circumstances which corroborated the citizen property owner's complaint, which, in turn, established reasonable suspicion that Simmons had been consuming alcohol on the job site. Because this Court concludes the City Water Department had reasonable suspicion to compel Simmons to submit to an alcohol test, the Court finds there was no Fourth Amendment violation.

The City Water Department also had just cause to terminate Simmons from his job as a Water Distribution Repair Worker on April 26, 2001. Meiers conducted a good-faith investigation into the allegations of attempted extortion and alcohol consumption on the job site, which included an interview with Jenkins, from whom Simmons had tried to extort $500 for the

repairs to the water service supplying Jenkins's property. Undoubtedly, attempted extortion, by itself, is sufficient to warrant an employee's dismissal. At the conclusion of Meiers's pre-disciplinary fact-finding investigation and pre-disciplinary hearing, at which time Simmons was afforded the opportunity to present his case, Meiers concluded there was credible evidence that: Simmons attempted to obtain money from a citizen; Simmons was drinking alcohol while on duty in violation of long-standing Water Department policy; Simmons refused to submit to alcohol testing at Methodist Hospital; and, at the pre-disciplinary hearing, Simmons repeatedly misrepresented the facts and circumstances surrounding the incident. As a result, Meiers recommended Simmons be dismissed. Because attempted extortion, alcohol consumption while on the job, and misrepresentation of facts at a Departmental hearing are all grave violations of the City Water Department's policies, the City had just cause to terminate Simmons.

Finally, Simmons claims he is entitled to a refund of the City's portion of contributions it made to its Defined Benefit Pension Plan on Simmons's behalf. Simmons's claim lacks merit. As part of the partial settlement agreement reached between the City and DC-33, the City agreed to reinstate Simmons on the following conditions: (1) he must submit to a regular medical evaluation including a drug and/or alcohol test; (2) he must serve a probationary period; and (3) upon his reinstatement, he would be entitled to enroll as a full participant in the health and welfare benefits program. The agreement did not resolve compensatory damages issues between the City and Simmons.

Simmons lost the opportunity to be reinstated, however, when he failed to appear for the requisite medical evaluation. In addition, because Simmons had withdrawn his portion of the contributions made into the City Pension Fund shortly after he was terminated on April 26, 2001, Simmons's account was closed. Pursuant to the terms of the Plan, an employee who leaves his

Case 2:03-cv-00371-JS   Document 131   Filed 03/29/12   Page 10 of 11

employment or, for whatever reason, closes his account or is not entitled to a Pension benefit, is entitled to a refund of the contributions the employee made to the Fund during the employees' employment, but is not entitled to any refund of the City's direct contributions. Simmons is therefore not entitled to receive a refund of the contributions made directly to the Pension Fund by the City on his behalf.

Because the City had reasonable suspicion to compel Simmons to submit to an alcohol test, his constitutional rights were not violated, and because the City had just cause to terminate his employment, Simmons is not entitled to economic or other damages as a result of his termination. Simmons's request for compensatory damages, consisting of back pay, interest and recoverable costs is denied, and judgment will be entered in favor of the City of Philadelphia and against Leroy Simmons in no amount.

 **CONCLUSIONS OF LAW**

1. The City of Philadelphia Water Department did not violate Simmons's constitutional rights because a private citizen's complaint that Simmons had been consuming alcohol on the job, coupled with Augustyn's observations of Simmons's physical condition at the hospital, together, created reasonable suspicion to require Simmons to undergo alcohol testing.

2. Just cause existed to terminate Simmons from his employment with the City Water Department on April 6, 2001. The Water Department conducted a good-faith investigation into the allegations and determined there was credible evidence of attempted extortion and consumption of alcohol while on duty, and Simmons repeatedly misrepresented the truth surrounding the January 26, 2001, incident at his pre-disciplinary hearing, all serious violations of long-standing City policy.

10

3. Simmons is not entitled to economic damages because he was terminated from his employment with the City of Philadelphia for just cause.

4. Simmons is not entitled to a refund for the portion of the City's share of contributions made directly to Simmons's City Pension Fund when he was a covered employee.

5. Since his dismissal more than a decade ago, Simmons has not mitigated his economic damages by diligently seeking and securing another job.

An appropriate Order follows.

                              BY THE COURT:

                              /s/ Juan R. Sánchez
                              Juan R. Sánchez, J.